And I'm sure they should have stayed for you, too. Well, I don't know about that, but my client was on a lot of drugs, a lot of drugs. I don't know that that's necessarily helpful, in your case. Well, maybe I could just be on a lot of drugs, and then we could all be on a lot of drugs. Anyway, good morning, Your Honor, and may it please the Court. Jan Norman on behalf of Charles Windham. And I would like to reserve five minutes for rebuttal, if necessary. And if I start coughing, I apologize in advance. I've got a sinus infection. Okay, I think in this case, there are two key issues. What we've got here, and this is the case, what distinguishes this case from the decision of this court in Crosby and the decision in Gonzales, is my client has effectively been sentenced to life without possibility of parole. At the time that he was sentenced, he was given three consecutive sentences of 25 years to life. He was 48. Now, unless he has the length of life that only you can imagine, this is essentially a sentence of life without possibility of parole. I should know this, but I don't know the answer. Let's assume, which is counterfactual, but let's assume that he's only got one, 25 to life. Is he eligible for parole before the expiration of the 25? Well, I understand he's no. So it's 25 period. That's the minimum. At which point he becomes eligible for parole on a 25 to life. Okay. But- So even at 25 to life, he's going to have to take pretty good care of himself to be eligible. Still alive by the time he becomes eligible. And as a defendant, and I think it's, is it Andrade? Is that how you pronounce Lockyer versus Andrade? As close as I can get. Okay, thank you. He had a 50 year to life, and he was 37. But so it's still, but it was still conceivable that he could- The bottom line, counsel, is it's a pretty serious sentence. We all agree with that. I don't think anybody would disagree with that. Some people might even call it draconian, but let's assume- All right, that's what I was referring to. Let's assume that all of that is true. That in and of itself doesn't get you anywhere unless the sentence is justified. Now, we know from precedent that simply neglecting through inadvertence to register isn't going to get you there, right? Correct. But that's not what happened here. That's also correct, your honor. Your client willfully, apparently, took off. And he took off without notifying anybody, and he went to a different state. And then he came back, and instead of putting himself in a position where he could be readily discovered with his mother, I believe it was. She was living in a trailer or something, I'm not sure. Correct, it was a Cox Street address. Right. He was living out of his car specifically to avoid detection. And the only way he did get finally arrested was by reporting an armed robbery, I gather, or something of that kind. Well, he also registered for a job that's in his mother's address, but okay. Right, all right. But was he the victim of some kind of a robbery? And am I wrong? I think I'm right. A truck jockey. If you're a truck jockey, yeah. Yeah, so that's how he- Okay. You know, it's kind of like the guy who, well, I won't get into it. I had a similar case. Isn't this the very reason why we have sex offender registration, so that you don't have people who are presumptively dangerous in their propensities wandering around unsupervised in the community, unbeknownst to either law enforcement or to the community, and who would therefore be capable of further horrific acts? I agree entirely with you that that is the purpose of the sex registration requirements. My position would be that in terms of the violations that were committed by my client, a sentence of 25 years to life, or even, well, 50 years to life, I think in my client's situation, would be equivalent to life without possibility of parole. So you're saying it's substantively unreasonable. It's substantively unreasonable because, first of all, you look, okay, he left and he went to Alabama. Well, in terms of, I mean, maybe the people in Alabama should have been known, but in terms of the jurisdiction of California, once he's out of the state, we're not interested in California protecting our citizens. He comes back, he has an address at his mother's house. He does say that he leaves his belongings there. The police are able to, you know, to verify that he's there. He was there when he first. But he didn't provide any registration once he returned to California. That's correct, Your Honor. I'm not suggesting. The police really have no reason to think that he's at his mother's address. That's just one place that they would go looking for him. That's one place that they would. Back in California. Didn't he dye his hair? I think he dyed his hair. That's in the record. Didn't he dye his hair to avoid being observed and therefore being detected? Your Honor, he may have decided to take any of a number. He also said he never registered because he never had a residence more than five days. And so he just kept driving around in his car. No, he testifies at one point that he both shaves off his mustache and bleaches his hair in order to avoid detection. Although what he's talking about, he's worried about the parole violation arrest warrant that he's got outstanding. I mean, he's got two problems. He's got a sex registration and he's got his parole violation. And he testifies, I shaved off my mustache and I bleached my hair blonde to, so that I wouldn't, to reduce the chances of my being picked up on parole violation. And I'm not, I'm not going to argue that, that he was, you know, being the model citizen, he clearly violated those two statutes. He failed to register when he came back in 2001, and he, and he didn't register again in 2002. However, I would argue with, with regard to the 2001-2002 segment, although it was denied on direct appeal under California law. My argument would be, in terms of a, of a, an Eighth Amendment analysis, that's pretty much of a con, an ongoing criminal conduct. I mean, he isn't, yes, it's a longer period of time. They may not know what he's doing. But he's basically failing to register when he returns to to, to California. So again, okay, maybe 25 years to life for that. But what we've got here is 75 years to life on what are three regulatory violations. Albeit that they are important. California Supreme Court in, in Coley has made pretty, pretty clear what it, what it thinks of this. I mean, it was, it, it set out pretty clearly that it, it didn't think that in cases like his, that this was a mere technical violation, which is what we said in Gonzales. I'm not saying it's a technical violation. What I'm comparing it to is where there's an actual crime. In other words, he didn't get picked up because he went out and committed another crime. Certainly not another sex crime. What he's picked up and given 75 years to life for, is failing to register. Failing to notify the police where he is when he comes back from Alabama. And my argument, your honors, is that the, the, the sentence of 75 years to life is grossly disproportionate to the crimes he's actually committed. And if you look at the difference between Crosby and Gonzales, you see that, well, there's a number of differences. But in Crosby, first of all, you can, also have to remember, the AEDPA is not applicable in this case. It was applicable in Crosby. It was applicable in Andrade. But also, in each of these cases, where the court, both this circuit and also the United States Supreme Court has gone through the analysis, the crucial variable has been whether there's eligibility for parole, where there has been not, no chance of parole. Or I can't say where there's been no chance of parole, they've, they've held it. But they basically said, well, this is draconian, this is excessive. But hey, he can still get out on parole. And that's the distinguishing factor in this particular case. So, so the argument you're making, and I saw it, I think, particularly in your reply brief, is that, well, perhaps one of these sentences, 25 years to life, might be permissible to sentence him for three separate violations under the same statute, and then to give him consecutive 75 years. That's, that's where your Eighth Amendment argument comes in. Yes, it is, Your Honor. And, and. So you're not contesting that the State could have put him away 25 years to life. No, and I would not, in fact, I don't think anyone would have granted a certificate of appealability on that issue, because 25 years to life has been upheld repeatedly. So that is, that is basically. The question is the sentence is on top of the 25 years to life, yeah. And one that, that, one that equates to life without possibility of parole. So, so what really is at issue here is just the trial court's judgment that it ought to be consecutive rather than concurrent. You have three separate regulatory violations, because every year you're required to do it. That's why he's. Correct. And under the law, the California Court of Appeals held that they did not have to, that the judge did not abuse its discretion in imposing three consecutive sentences, because there was three separate violations in three separate years. Right. The impact, however, of sentencing. All you're really challenging, then, is, is. The Eighth Amendment. Is, yeah, right, I understand. It's an Eighth Amendment challenge, but all you're really challenging is the fact that these are consecutive sentences. Correct, Your Honor. At the end of the day, if the judge had sentenced him to one period of 25 years to life and were on the other two concurrent, I would not be here wasting your time. And I will hold the last five minutes, unless the courts have an additional question. Let's hear from the State, and then we'll have another chance to hear from you. Thank you. Good morning. May it please the Court. Deputy Attorney General Merith White for Respondent. I think based on Mr. Windham's incredibly violent criminal history, California took a huge risk when it released Mr. Windham from prison in 1999. And to protect that public, protect the public from that risk, he was required to register his whereabouts. Not only did he fail to register, but he made repeated calculated decisions to avoid contact with law enforcement and thwart their efforts to keep track of him. And this posed a very serious risk to the people of California. The Eighth Amendment does not demand that California roll the dice on Mr. Windham again, and allow him again to subject the citizenry to that very real risk of him committing another violent sexual offense. The roll of the dice that Mr. Windham's lawyer is asking for is a quote, roll the dice to your phrase, to have him be eligible for parole 25 years after he's sentenced at age 48. So 25 plus 48 is at age 73, he's eligible for parole. And of course, eligibility for parole doesn't mean you get parole. So the rolling of the dice is that he might be eligible for parole at age 73, and he may or may not get it. So we're not talking about putting him out on the street right now. No, I understand that. That's the degree of the gamble. And I would agree that a sentence of 75 to life with a defendant who was sentenced at age 48 is essentially a sentence of life without the possibility of parole. I don't think I can say with a straight face that at 100 and something he would be. It's outlawed. That's true. And so I think what the issue is, does California have to take that risk again, ever? And I think under the Eighth Amendment, the state does not have to take that risk again, ever. Let's look at the original crime for which he was convicted. He impersonates a police officer. Yes. He takes two young girls into his car on the pretense that he is a police officer picking them up. For a curfew violation. For curfew violations. He puts the younger one in the trunk. Yes. He rapes the older one twice. Yes. Once. With a taser. Yes. He handcuffs her. He strangles her until she is unconscious. That's true. He then takes the girls, releases them alive. But one physically harmed seriously and the other one at least severely traumatized, says don't say anything. That's the crime. With one caveat, which is that he rapes the one girl in the first location, puts her back in the car, moves her to another location where he rapes her again, which I think exacerbates the issue slightly. I think under any circumstances, he was convicted of two rapes. Two rapes on the same victim. That's true. And two counts. He didn't rape the one that was in the trunk. He did not. The two rapes are as with respect to the same victim. The two counts of kidnapping are with respect to the two victims. In addition. And there's a third count about the weapon. So how long did he serve? Fourteen years. Fourteen years? Yes. He was sentenced to 28. He was released in 14 years. But all of his prior strikes arise out of that criminal episode. All of his, yes. As far as we know, the strikes that were that were pled and proven in this case arise out of that incident. What we also know is that, for instance, I think you mentioned he was convicted as well of assault with a deadly weapon. That was not pled and proven in this case because it's not a strike offense. He admitted. That was a conviction arising out of that same episode. That was. He was convicted on five counts. Two rapes, two kidnapping, one deadly weapon. Yes. I think with respect to his criminal history as a whole, there may be other things we don't know about. For instance, he admitted on the stand he was convicted of embezzlement, which was not pled and proven in this case. Again, because it's not a strike offense. All that is to say that there may be additional crimes that comprise his complete criminal history. Would that information have been relevant on sentencing? I think it's relevant with respect to an Eighth Amendment analysis in terms of the extent of his criminal history. Do we know whether the trial court had the evidence of the other crimes, even if they weren't strike offenses before him? You know, I don't know. But I think we could tell from the probation report. Typically, that type of information would be included in the probation report. I read the probation report. The only thing in the probation report, in addition to this violent episode with the two girls and the two rapes, is a misdemeanor for which he was sentenced to probation and fine or several days in jail for carrying some kind of concealed weapon. Yes, I think I did see that as well. But that was a misdemeanor, and that was in 1980, five years before the rape conviction. Yes. But that was the only other thing that was in the pre-sentence report. Right. And I think the fundamental difference between, it sounds like everyone is in agreement that a 25-to-your-life sentence is perfectly permissible. And I think under Ewing, we would have trouble reaching a different conclusion. Ewing says 25 to life for grand theft with a defendant whose criminal history is essentially comprised of theft-related offenses is perfectly permissible under the Eighth Amendment. The difference between Ewing in this case, we have three separate offenses. We don't have one grand theft. We have three failures to register. And I'd like to address counsel's argument that it's essentially a continuing course of conduct. It's not. In this particular case, each violation of 290 was tied to a different move. His first count is tied to his move out of state and his failure to notify officials that he was leaving the state. His second count is tied to his move back into the state and his failure to notify officials that he was back in California. He moves again. The landlord testified that when he first came back to California from Alabama, he moved into an address on Alexander Street. And then he moves back to the Cox Street address, which is what he ultimately uses on his employment application. That's a separate move, which he again failed to register. So it's not as though he's staying in the same place, a place where someone could find him. The argument that law enforcement could have found him at any time at this Cox Street address is belied by the record. The- Well, in fact, the police go out and interview the mother, and the mother refuses to help. The parole officer made seven trips to the Cox Street address after the initial meeting with the defendant, trying to find him and could never find him at that address. The sheriff's department made a separate attempt to find him at that address and could not. A warrant was issued for his arrest. The FBI was called in to help locate this defendant, and nobody could find him. And as Your Honor pointed out, the only way we wound up tracking down Mr. Windham was because he called in to report a carjacking. And that's ultimately, and he called in to report a carjacking 90 miles from the Cox Street address. He was ultimately picked up in Coachella, not in Paris. So this is a very factually different scenario than Gonzalez, where Gonzalez commits- Overall, the argument is a little more visceral. What your opposing counsel is basically arguing is, look, here's a guy who committed some pretty horrific crimes. I don't think anybody would- I would hope no one would dispute that. And he serves 14 years, which is not a small amount of time, but in comparison to what he now gets for not committing any other substantive offense but the failure to register offenses, if you will, he gets life in prison. That's the argument. That is the argument. And I think the reasoning, if we look at the case law on the Eighth Amendment, the factors that are considered under Salem and under Ewing with respect to the gravity of the offense, all point in favor of this not violating the Eighth Amendment. And that is, we look to his prior crimes. We look to his criminal history. And what Ewing talked about was the notion that the state has an interest in incapacitating habitual offenders. Here, it's even more egregious. We're not talking about incapacitating a petty thief. We're not talking about, as in Salem, the same type of defendant. We're not talking about incapacitating somebody who steals $100 here, $100 there. What we're talking about is reducing the risk that he, this defendant, Mr. Windham, goes out and kidnaps and rapes a 16-year-old again. And the state has a very heightened interest in that type of incapacitation, which is fundamentally different. You get the argument, but you use the word, maybe in haste or maybe characterizing the other cases, habitual offenders. No, he's not a habitual offender. The offense we have is horrible, but it just happened this one time. So we're not talking about someone who's incorrigible, who has this long rap sheet and so on. No, we've got some guy, I mean, I don't think beyond what I've been reading about in the record, who does one horrible thing, maybe has horrible thoughts twice a week, but the only thing we've got on the record is one really bad criminal episode. Well, I think what we do know is that there was some criminal behavior before that. I think it appears to be minimal in that there was a misdemeanor offense and he's admitted to an embezzlement offense. Some weapon for which there's no jail time. That's true. But probation and then either a $500 fine and a few days in jail, he could choose. Right. That was the previous misdemeanor, right. We know, in addition to that, that the reason he's not a habitual criminal is because he was in custody for 14 years. Within six months of being released from custody, he commits his first registration offense in this case. Yes, he was in prison for 14 years, but he, I'm doing my math so it's a little bit approximate, but he's 47 or 48 at the time of the same thing. In this case, yes. In this case, he's been out a couple years by this time, so maybe he got out when he was 46. He went into jail roughly at age 32. That's true. Roughly, roughly. I may be off by a year or two. Yes, I think that's probably fair. We don't have a long rap sheet leading up to that. We've got this one really bad crime. And again, I think we may or may not have the complete history. We know from his testimony at trial that there is an embezzlement offense. We don't have any evidence that he committed another sexual offense. No, that's true. We don't have any. Let me ask you this question, and I don't know the answer because I don't know California's criminal law that well, but let us assume that he would have registered perfectly appropriately. He didn't move. He registered. If he did move, he registered appropriately, so you don't have any of those issues. But while he's registered, he goes out and commits, say, a rape. Would he have gotten life without parole for that? Yes. He would have. Yes. He would be sentenced under the three-strikes law. Actually, at this point, he'd be sentenced under the one-strike law as a repeat sexual offender. He would have gotten a life sentence had he committed it. Yes. So he's essentially, my point is, he's essentially being sentenced in the same manner for not registering as if he had gone out and committed another heinous offense. Yes, but the Supreme Court has said that that's perfectly permissible in Ewing. They addressed this very issue and said California has decided that they're not going to draw a distinction between the type of felony that's committed as the third strike and that all felonies committed as a third strike, this is obviously under the prior version of the three-strikes law, could result in a 25-to-life sentence and that that's perfectly permissible. That does not violate the Eighth Amendment. Did he get, did he have to be charged separately with the parole violation? Did he suffer any penalty because of the parole violation? He did. He served another year in custody, I believe prior to this case, for the parole violation. I think that's in the record, although I can't be certain. So the parole violation doesn't have to be charged as a separate offense and considered here as part of that. He's just, they just get to pick him up. Yes, I mean, he's entitled to a hearing, but under, he has sort of different procedural protections. But yes, he was charged with a parole violation. I do believe he served a year in prison. And the parole violation was for leaving the state? Absconding. Yeah. No, I think he violated it as soon as he left the state. Yes. He, and to your point, one of the things that this Court looked at in Gonzales and in Crosby was the notion that, you know, there are these sort of passive harmless violations of the sex offender registration law, where Gonzales registered nine months prior and three months after there was never a period of time where law enforcement had difficulty finding him. That's entirely different here. And in addition to the eight attempts to find him at his registered address, he changed his name when he moved to Alabama. He assumed a new identity. He changed it again when he moved back into California. On top of that, as Your Honor mentioned, he changed his appearance. He dyed his hair and he shaved his mustache. Although his employment as a courier truck driver was in his own name. Yes, although in that instance, he lied completely about his Military service. Military service and his prior. So he has a demonstrated... But I want to make sure we got the record clear. Even while he is seeking to evade the authorities, it's clear that he's doing that. When he applies for this job, he's doing it in his own name. He did apply in his own name. Yes, that's true. I got the point about lying on him. He's very clear that he lied about it. He said he was a Master Sergeant in order to sort of cover up the fact that he was in a period in jail. He's quite sophisticated, actually, about how high up in the Sergeant ranks he would have been if he'd been in the military that long. He's very clear about why he lied in the manner that he did. What did the British say? Too clever by half? All of that sort of... A little bit of lawyer's law, just to make sure. I think I know the answer, but I want to make sure. Sure. You didn't argue failure to exhaust. No. And you didn't argue AEDPA. True. So I think what we're at here is an exhausted claim that we look at de novo without going through the deference of AEDPA. Yes. We're not asserting any procedural defaults. I think just in sort of quick summation, there's nothing in the Eighth... And the Eighth Amendment jurisprudence is all very clear that if reasonable minds can differ about whether this is an appropriate sentence or an inappropriate sentence, it's not a violation of the Eighth Amendment. And when we start talking about 25 to life versus 50 to life, what we're essentially asking California to do is to bring its sentences in strict proportionality to its crimes. And the cases have been clear that strict proportionality is not required. Only the sentences that qualify as grossly disproportionate are those that violate the Eighth Amendment. So parsing between a term of years where there's a possibility of parole, but no right to parole and no, you know, definitive release date, you're asking California to bring its sentences within this notion of strict proportionality, which the Eighth Amendment does not require. Here he committed three separate offenses, sophisticated evasion of law enforcement, which is California's only manner of protecting the public against a violent sex offender. And for those three separate offenses tied to three separate moves, he was punished appropriately with 25 to your life sentences. Unless the Court has further questions, please submit. Thank you. Thank you. Ms. Norman. Yes. Gosh, I was taking notes. I don't even know where to start. First, well, I think Ewing is distinguishable on the fact that, yeah, what happened in that case is they actually committed another theft, and it was a petty theft with a prior which qualified as a felony. And the issue was a sentence of 25 years to life. Here we have a regulatory violation and a sentence of 75 years to life. Well, you know, that's one of the things that we relied on in Gonzales was that it did appear to be a mere technical violation of the law, and that was the term that the California Court of Appeal had used in Carmody. But the California Supreme Court, post-Gonzales, has now issued an opinion in Coley. It's a unanimous opinion written by the Chief Justice, making very clear that California takes this very, very seriously, and that when we have violations that are not mere technical violations, that California will punish them severely. And I have no problem with that, Your Honors. And I realize that in Gonzales they talked about it being a technical violation, but I also think they looked at the fact that it was 25 to life, and it was also under an ADEPA standard of deference to the California Court. I don't have a problem. The court, my opposing counsel, keeps talking about what a horrible character my client was. I'm not trying to get up here and defend my client. I'm not trying to say that he wasn't trying to avoid detection, although I think, truth be told, it was because he didn't want to get violated for probation rather than the issue of, I don't think he was doing all that to avoid a year in prison if he had known that he faced 75 to life, if and when he was picked up. Well, counsel, basically, aren't we really talking about, when you back all of this out, the exercise of prosecutorial discretion to charge these separately, and then the judge's decision to run them consecutively? Isn't that what we're talking about? I think the way to phrase it, Your Honor, is we're not saying that prosecutors don't have the discretion to charge it, and that judges don't have the discretion to find three separate violations. But what we are saying is that when you have a regulatory violation,  a regulatory violation that serves the purpose of the case, serves an important purpose of protecting the public, that the sentence that is imposed cannot be grossly disproportionate to the crime that's committed. This is not, he has not committed another offense. Yes, he committed a horrific offense in 1985.  Gonzalez committed a rape. Neither one of these cases, I mean, focusing on, you know, the fact that he's a bad character doesn't... You refer to this as a regulatory offense. I mean, it's a regulatory offense if somebody sells misbranded drugs that might kill people. It's a regulatory offense to do a whole host of things which could, if the circumstances play out, result in severe harm to the public. Here is an individual who committed a very violent series of acts against two very young girls. And they weren't women yet. How old were they? Sixteen. And, you know, kidnapping. And he's stunning them with a gun. I mean, he's choking. I mean, I think what you have here is a very strong interest, which you've admitted. You've acknowledged. Yes. California has a very strong interest in keeping tabs on this fellow. Sure. And he's doing everything he can to make sure that they don't. And he commits no crime. Well... You asked the question about... I mean, he did 14 years for the crime that he committed against these girls. We don't have the court in this court that said neither in Gonzales or Crosby. In Gonzales, the man had committed a rape. Let's see. He had committed a... He had possession for cocaine, a conviction for a lewd act on a child under the age of 14, a conviction for attempted rape, a conviction for second-degree robbery with force. I mean, this guy did not have a pretty record. And in Gonzales, even applying the adeptus standard, they found that 28 years to life was excessive. I don't think we can say that this man is entitled to life without possibility of parole because in 1985, he committed a horrific crime for which he spent 14 years in prison. He has been punished. And in terms of a regulatory crime, if I sell adulterated food and somebody eats it, they're going to be harmed. He did not harm anybody by not being registered. If he had then, in fact, gone out and committed another crime and the police wanted to know where to find him, it would have been helpful to have him be registered. But short of him not being registered, there was no specific public harm to the public. And that's why I'm saying if you're going to give him 14 years for committing this horrific crime that we've been all talking about and the age and all that stuff, okay, he did his 14 years. Now you're going to give him life without possibility of parole? Well, he actually, I think, got more than 14 years, didn't he? And he was let out. He got 28 years. He served 14. Okay, so 28 years. And they gave him a break to let him out. And then he proved himself somewhat untrustworthy. Wouldn't you agree with that? Well, I would submit that a lot of people that are released from prison after 14, I mean, we're looking at people with prior criminal records. They are not the best citizens in the world. And if you want to talk about, I mean, the government pointed out that he had two crimes. He left without telling them. He came back without telling them. Well, you know, my argument would be that's pretty much the same act. You leave and you come back. And then he stayed without telling them. Okay, and then he stayed without telling them. It's clear that his continuing course of conduct, that technically produces at least three violations. Okay, and I agree with you. But they are not violations that result in any harm to anybody in the public and do not warrant a disproportionate sentence of 75 years to life. Got it. Okay. Thank you very much. Thank both sides. I mean, you both argued the case very nicely. It's a tough case. It is. It is a tough case. Thank you. Thank you very much. Wyndham v. Cate now submitted for decision.
judges: Ezra, Fletcher, Bybee